

# NUMBER 13-25-00224-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GOODLEAP, LLC,                                                    Appellant,

v.

SAMUEL RAMIREZ GARZA,                                   Appellee.

## ON APPEAL FROM THE 398TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca**
**Memorandum Opinion by Justice Fonseca**

By two issues in this accelerated interlocutory appeal, appellant GoodLeap, LLC (GoodLeap) argues that the trial court erred by denying its motion to compel arbitration of claims raised in a lawsuit by appellee Samuel Ramirez Garza. Because we agree, we reverse and remand.

## I.    BACKGROUND

In April 2022, two door-to-door salesmen employed by Vantage Point Solar, LLC (VPS) visited Garza's home in San Juan, seeking to sell him solar panels. In his petition, Garza alleged that the salesmen promised him the solar panels would provide enough power to eliminate his monthly electric bill, and that he would only be responsible for a monthly payment of $224. According to Garza, the salesmen also said that, as part of the transaction, they would (1) provide him with a $7,000 check with which he could pay off unrelated debts, and (2) install a new carport roof at his house. Garza agreed to these terms, and he signed and initialed his name electronically on a tablet provided by the salesmen. The negotiations were done entirely in Spanish. The solar panels were installed at Garza's house in the summer of 2022; however, the panels were not connected, and Garza was not provided with a $7,000 check or a carport roof.

In September 2022, Garza's son discovered that a "Sales and Service [A]greement" relating to the solar panel transaction had been sent to Garza's email account by Eagle View Marketing, LLC (EVM) on April 19, 2022. According to Garza, the PDF document attached to the email listed a "total installation fee of $55,404" and indicated that it was "'signed' on April 20, 2022—the day after the email was sent to [him]."

Garza's petition alleges that, "[t]hrough the process of requesting debt verification in November 2022," he "became aware of a new and totally different document" entitled "Residential Solar Installation Agreement" dated May 20, 2022. According to Garza, this document was the same as the one his son discovered in September, except that it reflected a "total installation fee of $62,580.06." Both the "Sales and Service [A]greement" and the "Residential Solar Installation Agreement" indicated that they were electronically

signed by Garza and by the owner of Texas Solar Broker, LLC (TSB).

Later, "with the assistance of counsel," Garza discovered that he had received an email from GoodLeap on April 19, 2022, with subject line: "Loan documents from GoodLeap for Samuel." The email asked Garza to "review and electronically sign the attached loan documents." Garza claimed that he first heard of GoodLeap when he noticed a payment to it had been made from his bank account; because he did not recognize the name, "he went to his bank and cancelled the auto[matic] payments from his account." He did not review or sign the documents attached to the email.

According to Garza, two VPS salesmen returned to his house in early 2023 and "informed [him] that the solar panels were not yet connected and that he owed money for the solar panel system." Garza proceeded to inform the VPS salesmen "that he would not allow the solar panels to be connected because VPS never provided him with the $7,000 check and carport roof he was promised." Garza then told the salesmen that he wanted the panels removed.

In 2024, Garza filed the underlying suit against TSB, VPS, EVM, GoodLeap, and others. He asserted that the defendants committed fraud, and he also raised claims under the Deceptive Trade Practices Act (DTPA) and Texas Home Solicitation Act (THSA). *See* TEX. BUS. & COM. CODE ANN. §§ 17.501(a) (DTPA), 601.052–.201 (THSA). Garza alleged that GoodLeap was responsible for the acts of all co-defendants as their agent and pursuant to the Federal Trade Commission Act. *See* 15 U.S.C.A. § 45(a)(1) (stating "unfair or deceptive acts or practices" are unlawful). He sought treble damages, rescission of the subject agreements, and a declaration that the agreements are invalid and unenforceable under the Uniform Electronic Transactions Act (UETA) and the federal

3

Electronic Signatures in Global and National Commerce Act (E-SIGN). *See* TEX. BUS. &

COM. CODE ANN. ch. 322 (UETA); 15 U.S.C.A. ch. 96 (E-SIGN).

GoodLeap answered the suit and moved to compel arbitration and abate the

proceedings, pointing to the following clause contained in a "Loan Agreement" dated May

20, 2022:

> All claims and disputes arising out of or relating to this Agreement . . . shall
> be resolved by binding arbitration on an individual basis. The arbitrator shall
> also decide any issues relating to the making, validity, enforcement, or
> scope of this arbitration agreement, arbitrability, defenses to arbitration
> including unconscionability, or the validity of the jury trial, class action or
> representative action waivers. YOU HEREBY WAIVE ANY
> CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND
> HAVE A TRIAL IN FRONT OF A JURY.
>
> . . . .
>
> Each party shall bear the expense of its own counsel, experts, witnesses
> and preparation and presentation of proofs. However, the arbitrator may
> award you reasonable attorney's fees and costs if this is expressly
> authorized by applicable law. Upon request, we will pay a portion of the fees
> and expenses of the arbitrator and the administrative fees and expenses of
> the arbitration.
>
> . . . .
>
> This arbitration agreement is made pursuant to a transaction involving
> interstate commerce. The Federal Arbitration Act (9 U.S.C. §§ 1-16) (the
> "FAA") shall govern this agreement to arbitrate including all arbitrability
> issues.
>
> . . . .
>
> YOU MAY OPT OUT OF ARBITRATION BY SENDING US WRITTEN
> NOTICE WITHIN 15 DAYS OF SIGNING THE AGREEMENT STATING
> THAT YOU WISH TO "OPT OUT OF THE AGREEMENT TO ARBITRATE
> DISPUTES." THE OPT-OUT NOTICE SHOULD BE SENT TO THE
> FOLLOWING ADDRESS: GOODLEAP, 8781 Sierra College Blvd.,
> Roseville, CA 95661.

In support of the motion, GoodLeap attached an affidavit by Maria Mellott, its

Deputy Chief Compliance Officer and custodian of records. Mellott described GoodLeap's

4

"internet-based" loan application process. She explained that GoodLeap first obtains the customer's "primary email address to facilitate communication and the sharing of documents and information," and then obtains other personal information from the customer to use in determining whether the customer qualifies for a loan. According to Mellott:

> 7. If the application for financing is approved, GoodLeap then transmits to the borrower's email address any key information and documents, including their proposed individualized financing terms.
>
> 8. After a potential borrower receives that information, if he or she is satisfied with the proposed terms of the Loan Agreement, the borrower can click a link within the subject email to proceed to the signing of the Loan Agreement. GoodLeap will then transmit the Loan Agreement to the borrower via email for signature via DocuSign. The borrower is then presented with the Loan Agreement for review and electronic signature.
>
> 9. Documents transmitted via DocuSign can only be opened by an individual with access to the borrower-provided email address.
>
> 10. Once the Loan Agreement is signed, GoodLeap receives a DocuSign certificate for each Loan Agreement executed via DocuSign. The DocuSign certificate records the date and time of the execution of the Loan Agreement document by the borrower, among other key information.

Mellott stated that, according to records "kept in the ordinary course of GoodLeap's daily and regular business," Garza executed the "Loan Agreement" via DocuSign on May 20, 2022. A copy of the agreement was attached to the affidavit, accompanied by a DocuSign "Certificate of Completion" indicating that the document was emailed to Garza at 6:35 p.m., was viewed at 6:36 p.m., and was signed at 6:38 p.m.

GoodLeap also attached to its motion a purported transcript, translated from Spanish, of a phone call between Garza and its customer service representative on July 28, 2022. According to the transcript, Garza confirmed that "[his] loan has a 25-year term,"

5

and the representative informed him that the first payment of $223.80 was scheduled for September 25. To effectuate automatic payments, Garza provided the last four digits of his social security number and the routing and account numbers for his bank account. When Garza raised the issue of the carport roof, the representative advised him to review his sales contract with TSB to determine "what is in the contract, what is it that they have to comply with you." Garza replied, "Oh. Okay. That's fine." The transcript was accompanied by an affidavit of a translator.

Garza filed a response to the motion arguing: (1) the "Loan Agreement" is unenforceable because there was no meeting of the minds; (2) he was not given notice of the arbitration clause; and (3) the arbitration clause was both procedurally and substantively unconscionable. The response included Garza's affidavit stating that he "was never informed that the written contract contained an arbitration clause and never discussed arbitration with the sales agents." Garza also averred, among other things:

3.  My primary language is Spanish. I do not speak or read English. When the sales agents visited my home, they spoke to me in Spanish.

    . . . .

7.  While they were at my house, the sales agents showed me the tablet they brought with them and asked me to click several times where they were pointing with their hands. They scrolled through a document on the tablet, but I could not see the contents or words on the document. I could only see a few words, and they were in English, so I could not understand since I do not speak English. I could really only see boxes and lines to mark the screen. I agreed to click so that an electronic signature and initials could be applied, but I was never told that I was signing a loan document or applying for a loan.

8.  The sales agents never told me that I was going to be bound to two contracts with two different companies and I thought I was dealing with only [VPS]. The sales agents did not mention GoodLeap at all and I did not understand there was a separate loan agreement with

6

a company called GoodLeap until much later.

. . . .

10. I never saw a copy of any contract when the sales agents were in my home, either on their tablet or on paper.

11. I was not told I had the right to cancel the contract within three days and did not discover that they claimed there was a second contract— a loan agreement with GoodLeap—until several months later.

12. I never consented to communicate electronically or via email. Although the salesmen made a passing reference that I would receive information about the solar panels by email, they never asked for my consent. I believed that, if they sent me emails, the emails would only contain routine information about solar panels, not a final contract. I believed a final contract would be provided for my review at a later time. I did not realize that the contracts had been sent by email until well after the sales agents left my home, when my family members helped me retrieve the emails and I learned I had been bound to a long-term loan. I don't own a computer and never check email without help from my family.

In his response, Garza objected to Mellott's affidavit on grounds that it was conclusory, irrelevant, and not based on personal knowledge. Further, he objected to the exhibits attached to Mellott's affidavit and the purported phone call transcript as improperly authenticated.

Without holding a hearing or ruling on Garza's evidentiary objections, the trial court denied GoodLeap's motion to compel arbitration on April 1, 2025. This appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 ("In a matter subject to the [FAA], a person may take an appeal . . . under the same circumstances that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. [§] 16."); 9 U.S.C.A. § 16(a)(1)(C) (authorizing an interlocutory appeal from an order denying a request to compel arbitration).

7

## II.  Discussion

By its first issue, GoodLeap argues the trial court erred by denying its motion to compel because "the evidence establishes the genuine nature of [Garza]'s signature on the contract." It contends by its second issue that the court erred to the extent it found the arbitration clause unconscionable because the contract "expressly delegates issues of unconscionability to the arbitrator."

### A.  Applicable Law and Standard of Review

Under the FAA, a party seeking to compel arbitration must establish that (1) a valid arbitration agreement exists and (2) the claims fall within the scope of the agreement. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 282 (Tex. 2021); *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 397 (Tex. 2020); *Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 227 (Tex. 2014). If the party seeking arbitration satisfies its initial burden, the burden then shifts to the party resisting arbitration to present evidence supporting a defense to the enforcement of the arbitration provision. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). Once the burden shifts to the nonmovant, a "strong presumption" arises in favor of arbitration. *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011). "Absent a defense to enforcing the arbitration agreement, the trial court has no discretion but to compel arbitration and stay its proceedings once the existence and application of the agreement has been shown." *In re Autotainment Partners Ltd. P'ship*, 183 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding) (citing *In re J.D. Edwards World Sols. Co.*, 87 S.W.3d 546, 549 (Tex. 2002)).

"We review a trial court's order denying a motion to compel arbitration for abuse of discretion." *Henry*, 551 S.W.3d at 115 (citing *In re Labatt Food Serv., L.P.*, 279 S.W.3d

8

640, 642–43 (Tex. 2009)). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo." *Henry*, 551 S.W.3d at 115. Whether an arbitration agreement is enforceable is a question of law reviewed de novo. *Id.*

## B. Evidentiary Objections

As an initial matter, GoodLeap argues that Garza's objections to the evidence attached to its motion to compel "should not be considered by this Court or should be overruled." Citing cases involving summary judgments, GoodLeap contends that Garza "has failed to preserve this issue for review" by failing to obtain an adverse ruling on his objections. *See, e.g.*, *Vice v. Kasprzak*, 318 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Failure to secure the trial court's ruling on the objections to the summary judgment evidence also waives the complaint for appeal."). GoodLeap also offers substantive analysis explaining why it believes Garza's objections should have been overruled.

Garza has not filed a notice of appeal and does not complain about the trial court's failure to rule on his objections in his brief; therefore, he was under no burden to preserve any appellate issue. *See* TEX. R. APP. P. 33.1(a)(2). That said, Garza also does not dispute GoodLeap's assertion that the issues raised in his objections are "not ripe for appellate review." Instead, he posits that "[a]t this stage, th[is] Court need not be distracted by the parties' disagreement as to the admissibility of GoodLeap's evidence."

9

Moreover, Garza does not argue that his objections should have been sustained and does not present any argument in that regard. In particular, he does not contest the substantive grounds advanced by GoodLeap for why the evidence was admissible. Accordingly, without reviewing the merits of Garza's objections, we will consider the subject evidence in our review of the trial court's ruling.

## C.    Analysis

It is undisputed that the claims in Garza's lawsuit fall within the scope of the arbitration clause. *See Wagner*, 627 S.W.3d at 282. The parties dispute only whether the clause is valid and enforceable with respect to Garza.

In his responsive brief, Garza concedes that "[o]n this record, GoodLeap met its initial burden as the party seeking to compel arbitration" by "producing a contract allegedly signed by him." However, he contends that he "also met his burden by raising issues of material fact as to whether there was an enforceable arbitration agreement between the parties." Therefore, though Garza continues to disagree with GoodLeap that the matter should be referred to arbitration, he acknowledges that "[t]he trial court erred by summarily ruling for [him] without conducting an evidentiary hearing." He contends that "the proper remedy is to remand to the trial court to conduct an evidentiary hearing" under *Jack B. Anglin Co. v. Tipps*, in which the Texas Supreme Court held:

> [T]he trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

842 S.W.2d 266, 269 (Tex. 1992); *see In re Weeks Marine, Inc.*, 242 S.W.3d 849, 862 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding) ("When faced with conflicting affidavits, . . . a trial court may not adjudicate defenses to enforceability of an arbitration

10

agreement without an evidentiary hearing.").[1] Garza argues specifically that his affidavit generated a fact issue as to whether there was a "meeting of the minds" between the parties so as to give rise to an enforceable contract.[2] *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract."); *Bandera County v. Hollingsworth*, 419 S.W.3d 639, 645 (Tex. App.—San Antonio 2013, no pet.) ("'Meeting of the minds' describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract."); *Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex. App.—Amarillo 2008, pet. denied) (noting that "a 'meeting of the minds' is not an independent element of a valid contract" but "is merely a mutuality subpart of the offer and acceptance elements").

We disagree. In light of Garza's agreement that GoodLeap "met its initial burden," a "strong presumption" arose in favor of arbitration, and the burden shifted to him to show a defense to enforcement. *See Ellis*, 337 S.W.3d at 862. In his affidavit, Garza explained that when the VPS salesmen came to his house in April of 2022, he "agreed to click" on their tablet "so that an electronic signature and initials could be applied" electronically to the agreement which they were proposing. He claims that the salesmen never advised him he was applying for a loan or that he had the right to cancel the contract, but he does

---

[1] In its reply brief, GoodLeap argues that Garza waived his right to a *Tipps* hearing by failing to request one in the trial court and by failing to file a notice of cross-appeal. In light of our conclusion that there is no fact issue concerning the enforceability of the "Loan Agreement," we do not address this argument because no *Tipps* hearing is necessary. *See* TEX. R. APP. P. 47.1.

[2] As noted, Garza alleged in his petition that the "Loan Agreement" was unenforceable not only due to the lack of a meeting of the minds, but also due to violations of various statutes and because it was procedurally and substantively unconscionable. We note that the mere fact that the agreement is in a language which Garza claims he cannot not speak or read does not render it unconscionable. *See Delfingen US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 801 (Tex. App.—El Paso 2013, no pet.). In any event, Garza concedes in his brief that these issues do not affect the initial analysis of whether the matter should be referred to arbitration, in part because the arbitration clause explicitly states that "[t]he arbitrator shall decide any issues relating to . . . defenses to arbitration including unconscionability." Accordingly, we do not address those issues here.

not dispute that he intentionally caused his initials and signature to be electronically placed on the agreement. *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 206–09 (Tex. 2021) (concluding, where employer's representative testified that "it was impossible to complete [its electronic] hiring application without signing [a document containing an arbitration clause]," that employees' "[m]ere denials" that they signed the document "do not suffice" to create a fact issue); *see also CHG Hosp. Bellaire, LLC v. Johnson*, 644 S.W.3d 188, 189 (Tex. 2022) (reversing court of appeals' holding that appellee's "sworn testimony that she did not recall electronically acknowledging the arbitration agreement at issue created a fact question as to its validity").[3]

---

[3] As the Texas Supreme Court observed in *Aerotek*, once parties have agreed to conduct a transaction "[']by electronic means,' the [UETA] provides a standard for attributing electronic signatures to them." *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 205 (Tex. 2021) (quoting TEX. BUS. & COM. CODE ANN. § 322.009(a)). More specifically,

> [UETA §] 322.009(a) provides that an "electronic signature is attributable to a person if it was the act of the person." That "may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." . . . [S]ecurity procedures may include requiring personal identifying information—such as a social security number or an address—to register for an account; assigning a unique identifier to a user and then tying that identifier to the user's actions; maintaining a single, secure system for tracking user activities that prevents unauthorized access to electronic records; business rules that require users to complete all steps in a program before moving on or completing it; and timestamps showing when users completed certain actions. These examples are illustrative and not exclusive under [§] 322.009(a). The efficacy of the security procedure provides the link between the electronic record stored on a computer or in a database and the person to whom the record is attributed. A record that cannot be created or changed without unique, secret credentials can be attributed to the one person who holds those credentials.

*Id.* (footnotes omitted). In this case, though Garza denied in his affidavit that "he consented to communicate electronically or via email," the "Certificate of Completion" included with Mellott's affidavit indicates that Garza agreed to "use electronic records and signatures" by signing an "Electronic Record and Signature Disclosure" form at 6:36 p.m. on May 20, 2022. And though Garza denied owning a computer, the "Certificate of Completion" indicates that the documents were "[s]igned using mobile." In any event, because Garza did not deny that he electronically signed the "Loan Agreement," we need not determine whether Mellott's affidavit was sufficient to show the "efficacy of any security procedure" verifying Garza's identity. *Cf. Hous. ANUSA, LLC v. Shattenkirk*, 693 S.W.3d 513, 518 (Tex. App.—Houston [14th Dist.] 2023, no pet.) ("The party seeking to hold another responsible for signing an electronic contract must come forward with evidence to establish the efficacy of the security procedures utilized in the transaction.") (citing *Aerotek*, 624 S.W.3d at 204).

Regardless of whether any enforceable contract was executed during the April 2022 sales pitch, Garza recognizes in his affidavit that the "Loan Agreement"—the only agreement which contains the arbitration clause at issue in this appeal—was a separate agreement with a separate entity, executed approximately one month after his meeting with the salesmen. Crucially, Garza did not deny in his affidavit that he electronically signed the "Loan Agreement" on May 20, 2022, or that by doing so, he assented to its terms. *See Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013) ("Typically, a party manifests its assent by signing an agreement."); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996) (per curiam) ("We presume a party . . . who has the opportunity to read an arbitration agreement and signs it, knows its contents."); *McGonagle v. Stewart Title Guar. Co.*, 432 S.W.3d 535, 541 (Tex. App.—Dallas 2014, pet. denied) ("[O]ne who signs an agreement, even without knowledge of its contents, is presumed to have consented to its terms and is charged with knowledge of the agreement's legal effect."); *Turner v. Hendon*, 269 S.W.3d 243, 247–48 (Tex. App.—El Paso 2008, pet. denied) ("Absent proof and determination of mental incapacity, a person who executes a document is presumed to have read and understood it.").

The evidence conclusively established the existence of a valid, enforceable arbitration agreement between the parties, and Garza presented no evidence supporting a defense to enforcement. Accordingly, the trial court abused its discretion by denying GoodLeap's motion to compel. *See In re Autotainment Partners Ltd. P'ship*, 183 S.W.3d at 534. We sustain the issues raised on appeal.

### III. CONCLUSION

The trial court's judgment is reversed, and we remand with instructions to grant

13

GoodLeap's motion to compel arbitration and for further proceedings consistent with this memorandum opinion.

YSMAEL D. FONSECA<br>
Justice

Delivered and filed on the
23rd day of October, 2025.